# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

| | |
|---|---|
| WAUKESHA COUNTY ENVIRONMENTAL ACTION LEAGUE, COALITION OPPOSED TO THE WEST WAUKESHA BYPASS, UA, | ) ) ) ) |
| Plaintiffs, | ) )      Civ. No. _____ |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF TRANSPORTATION; ANTHONY FOXX, Secretary of Transportation; FEDERAL HIGHWAY ADMINISTRATION; GREGORY G. NADEAU, Acting Administrator, Federal Highway Administration; MARK GOTTLIEB, Secretary of the State of Wisconsin Department of Transportation, | ) ) ) ) ) ) ) ) |
| Defendants. | ) |

_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This suit challenges the Federal Highways Administration's ("FHA") and Wisconsin Department of Transportation's ("WisDOT") recent decision to construct and fund the "Waukesha Bypass" – a four-lane, north-south highway along the route of existing two-lane County TT between I-94 and the intersection of Highway 59 and County X on the west side of the city of Waukesha, Wisconsin.  *See* 80 Fed. Reg. 5,613 (Feb. 2, 2015); *see also* Waukesha Bypass Record of Decision ("ROD") (approved by FHA on Jan. 20, 2015).  By failing to (a) properly define the project's purpose and to meaningfully consider alternatives that may fulfill that purpose; (b) adequately address the project's direct, indirect, and cumulative environmental impacts; (c) concretely identify, describe, or commit to necessary mitigation measures; or (d)

1

appropriately permit and consider public input, the Defendants have violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Defendants' failure to properly mitigate adverse impacts and consider project alternatives also violates the pertinent provisions of the statutes governing the federal highway system (hereafter referred to as the "Federal Highway Statutes").. 49 U.S.C. § 303; 23 U.S.C. § 138. Accordingly, Plaintiffs Waukesha County Environmental Action League and Coalition Opposed to the West Waukesha Bypass, UA hereby request a declaration that Defendants have violated NEPA, the APA, and the Federal Highway Statutes; an Order vacating the Waukesha Bypass Environmental Impact Statement ("EIS") and ROD; and a further Order enjoining any activities in furtherance of the project until Defendants come into compliance with federal law.

## JURISDICTION

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## PARTIES

3.      Plaintiff Waukesha County Environmental Action League ("WEAL") is a Wisconsin nonprofit corporation dedicated to protecting Waukesha County's natural resources. WEAL focuses on projects that threaten to adversely impact the environment in Waukesha County and surrounding areas where its members live and recreate. During the past several years WEAL has devoted substantial resources – through member outreach, public education, and non-litigation advocacy – fighting proposals to resurrect the Waukesha Bypass, which was defeated when originally proposed many years ago. Cancellation of the project will free WEAL to spend its sparse resources on other critical environmental projects in the area.

2

4.      WEAL brings this action on behalf of itself and its approximately one hundred members, most of whom live in Waukesha County, including members who live near and enjoy the County TT corridor and the vital environmental resources in this area of the County.  These members will be injured by the adverse aesthetic, recreational, health, and property impacts from the Waukesha Bypass, as the new highway will increase traffic and associated development, alter surrounding land use patterns, and bring additional pollution to this area – such as particulates, nitrogen oxides, volatile organic compounds, carbon monoxide, and other pollutants that will be generated by the increased numbers of cars on and in proximity to the Bypass.  WEAL and its members' interests in participating in the decision-making process for the Bypass under NEPA and the Federal Highways Statutes have also been injured by the Defendants' failure to allow and consider public input in the manner required by these statutes.

5.      The interests of WEAL's members in continuing to enjoy the County TT corridor and surrounding areas in the manner they can today is injured by Defendants' decision to build the Bypass, and would be redressed if the Bypass were not built.

6.      Plaintiff Coalition Opposed to the West Waukesha Bypass, UA is a group of concerned citizens, who live on or near the project corridor and who will be adversely affected by the project, including because the project will threaten the health and safety of their children attempting to traverse the roadway to get from homes to parks and schools, and because the project poses other threats to their quality of life from impacts on property values, increased noise, litter, runoff from impervious surfaces, increased vehicle speeds, light pollution, and other environmental and socio-economic impacts.

3

7. Defendant United States Department of Transportation ("DOT") is the executive department of the federal government responsible for approval of highway projects.

8. Defendant Anthony Foxx is the Secretary of DOT, and is sued in his official capacity. Secretary Foxx is ultimately responsible for all DOT decision-making, including decisions of the Federal Highways Administration ("FHA").

9. Defendant Federal Highway Administration ("FHWA") is the agency within DOT principally responsible for highway planning and funding. FHWA, through its Wisconsin Division, was responsible with Wisconsin DOT for preparing, reviewing, and approving the EIS and ROD for the proposed Waukesha Bypass.

10. Defendant Gregory Nadeau is the Acting Administrator of FHA, and is sued in his official capacity. Administrator Nadeau is ultimately responsible for all FHA decisions, including approval of the EIS and ROD for the Waukesha Bypass.

11. Mark Gottlieb is the Secretary of the Wisconsin Department of Transportation ("WisDOT"), and is sued in his official capacity. Mr. Gottlieb is ultimately responsible for all decisions of WisDOT, including the preparation and approval of the EIS and ROD for the Waukesha Bypass.

## STATUTORY FRAMEWORK AND FACTS GIVING RISE TO PLAINTIFFS' CAUSES OF ACTION

### A. Statutory and Regulatory Framework

#### 1. The National Environmental Policy Act

12. NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its purpose is to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance

4

the environment." *Id.* at § 1500.1(c). Under NEPA, federal agencies are required to prepare an environmental impact statement ("EIS") regarding all "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(C). This EIS must describe (1) the "environmental impact of the proposed action," (2) "any adverse environmental effects which cannot be avoided should the proposal be implemented," (3) any "alternatives to the proposed action," (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id.*

13.     The Council for Environmental Quality ("CEQ"), an agency within the Executive Office of the President, has promulgated regulations implementing NEPA that are binding on all federal agencies. 40 C.F.R. § 1500.3. Those regulations require that the NEPA process be completed "before decisions are made and before actions are taken," *Id.* § 1500.1(b), and that the process begin with the agency properly "specify[ing] the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." *Id.* § 1502.13.

14.     Once the project purpose is properly defined, the agency must consider the relevant environmental impacts of the proposed action and all reasonable alternatives. *Id.* § 1502.14. As the regulations set forth, alternatives are the "heart of the" EIS, and must be presented along with the proposed action "in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision maker and the public." *Id.* § 1502.14.

5

15.     The EIS must then meaningfully address the direct, indirect, and cumulative environmental impacts of the proposed action and reasonable alternatives. *Id.* §§ 1508.7, 1508.8. Indirect effects are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable [and which] may include growth inducing effects and other effects related to induced changes in the pattern of land use." *Id.* § 1508.8(b). Cumulative effects are impacts "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ." *Id.* § 1508.7.

16.     Finally, an EIS must "include appropriate mitigation measures." *Id.* § 1502.14(f). The FHA has also promulgated NEPA implementing regulations, which similarly require that "[m]easures necessary to mitigate adverse impacts be incorporated into the action." 23 C.F.R. § 771.105(d). Consistent with the CEQ requirements, the FHA NEPA regulations also require that "[a]lternative courses of action be evaluated and decisions be made in the best overall public interest based upon a balanced consideration of the need for safe and efficient transportation; of the social, economic, and environmental impacts of the proposed transportation improvement; and of national, State, and local environmental protection goal." 23 C.F.R. § 771.105(b).

### 2.     The Federal Highways Statutes

17.     The FHA decision-making concerning road construction is also governed by several laws specific to the Department of Transportation. 49 U.S.C. § 303; 23 U.S.C. § 138. Those Federal Highways Statutes, and implementing regulations, require that where, as here, a road project will use certain public lands, the agency must demonstrate there is "no prudent and feasible alternative to using that land," and that the "project includes all possible planning to minimize harm to" such land. 49 U.S.C. § 303(c); 23 U.S.C. § 138(a); *see also* 23 C.F.R. §

6

771.135(a)(2) (requiring that in making such a determination the "[s]upporting information must demonstrate that there are unique problems or unusual factors involved in the use of alternatives that avoid these properties or that the cost, social, economic, and environmental impacts, or community disruption resulting from such alternatives reach extraordinary magnitudes.").

18.     These statutes also require meaningful" public hearings" for any project – such as the Waukesha Bypass – that goes through or near a city.  23 U.S.C. § 128(a).  As Congress explained in enacting this provision, the public hearings are required to be a "'town hall' type meeting in which people are free to express their views" and whose "purpose is to encourage public comment and discussion."  H. Rep. No. 91-1554, at 4-5 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5392, 5395-97; *see also* 23 C.F.R. § 771.111(h).

**B.     Relevant Facts**

**1.     The County TT Corridor**

19.     County TT is a two-lane road running south from Highway 94 for approximately five miles to County Road 59.  The road passes through three communities, the City of Waukesha, the City of Pewaukee, and the Town of Waukesha.  The County TT area includes open space and agricultural land, as well as suburban areas with a mixture of residential, commercial, and institutional land uses.

20.      Located primarily in the Pebble Creek Watershed, the area includes wetlands and floodplains.  County TT crosses Pebble Creek and an unnamed tributary of Pebble Creek south of Madison Street – both of which are designated "primary environmental corridors," meaning they contain especially high-value scenic, historic, scientific, and recreational features.  It also

7

crosses two "secondary environmental corridors" – areas with substantial but smaller concentrations of natural resources.

21.    There are also two recognized natural areas in the County TT corridor: the Pebble Creek wetlands and the Pebble Creek Railroad Corridor Prairie, both of which are along the southern portion of County TT.  The Pebble Creek wetlands is a sixty-acre area located both north and south of Sunset Drive owned by the City of Waukesha and private parties.  It contains wetlands on both sides of Pebble Creek consisting of a combination of sage meadow, shrub-carr, cattail marsh, and wet-mesic prairie.  The Pebble Creek Railroad Corridor Prairie is a  seven-acre area with good quality mesic prairie and lesser quality dry prairie.

22.    Several park and recreation areas are also located near County TT, including the Retzer Nature Center, Meadowview Park, South Park, Heritage Hills Park, Kidson Hill Park, Pebble Creek Park and Greenway, and Merrill Hills Country Club.

**2.    The Draft EIS For The Waukesha Bypass**

23.    On May, 2010, The FHA announced that an EIS would be prepared on the Waukesha Bypass.  75 Fed. Reg. 26,320 (2010).  Two years later, FHA and WisDOT released the Draft EIS for the project.

24.    According to the Draft EIS, the purpose of turning County TT into a four-lane Highway is to "provide a safe and efficient north-south arterial roadway on the west side of the City of Waukesha to complete the long-planned circumferential route around Waukesha; to accommodate growing traffic volumes along the corridor; and to improve roadway deficiencies that include tight curves, steep hills, narrow lanes, and lack of shoulders."  The Draft EIS provided that the project need "is demonstrated through a combination of factors that include

8

project history, regional/local transportation and land-use planning, traffic demand, safety concerns, existing roadway deficiencies, system linkage, and environmental aspects."

25.     The Draft EIS further explained that the Bypass has been planned for many years, and that completing the Bypass will carry out decisions made in several prior transportation planning documents.  The Draft EIS also explained that while the four-lane highway was originally planned as a Bypass to facilitate travel around the outer edge of the City of Waukesha, the development that has occurred along County TT in the meantime renders the road no longer useful as a Bypass.  It also explained that the southern portion of the Bypass will not follow the route of prior transportation plans.

26.     The Draft EIS stated that increased traffic demand in the coming years makes it necessary to build the Bypass to avoid unacceptable traffic levels.  In the Draft EIS the agencies rely on WisDOT guidelines to categorize County TT as an "LOS E" road, which is defined to mean a road with "slow speeds and traffic backups" and "high driver frustration."  Based on those guidelines and without considering any actual County TT road usage data, the Draft EIS concluded that one four-way intersection along County TT currently experiences almost a minute backup, and that, if unimproved, by 2035 that intersection will have an average of a five-minute backup.

27.     The Draft EIS stated that the crash rate on County TT exceeds the statewide average on most segments.  It found that other sections have crash rates lower than the statewide average.

28.     The Draft EIS stated that the project has the support of the local community.

9

29.    Although the Draft EIS identified several alternatives to the Waukesha Bypass, each alternative was dismissed without considering how the environmental impacts of the alternative might compare to the impacts of the chosen Bypass alternative.

30.    The Draft EIS identified two alternatives to building any highway project – a Transportation Demand Alternative that would reduce traffic through mass transit and other strategies, and a Transportation System Management Alternative that would improve the existing road network through measures such as improving intersections, promoting carpooling, and facilitating transit, bicycle and pedestrian movement.  These alternatives were rejected in the Draft EIS, without any concrete consideration of their environmental impacts, on the grounds that while they would "minimize environmental impacts and cost less" than the Bypass, each of them "alone would not fully address project purpose and need with respect to safety concerns, existing highway deficiencies, and future traffic demand."

31.    As to alternative ways of building a highway project, for most of the length of County TT, only *one* route alternative – along existing County TT – was considered beyond the initial alternative screening process.

32.    The two-lane alternative on the County TT alignment was rejected on the grounds that it could not sufficiently address the safety and anticipated traffic concerns that the Draft EIS stated would be solved with a four-lane alternative.

33.    As to direct impacts, the Draft EIS identified various impacts to wetlands, floodplains, water quality, and other resources.

34.    As to indirect impacts, and in particular the extent to which the Waukesha Bypass would influence development patterns, the Draft EIS concluded that the Bypass will not itself

10

cause development, but that development has occurred because the Bypass has long been anticipated. The agencies reached this conclusion based on a review of planning documents and a survey and other input from transportation officials. The Draft EIS concluded that the Bypass "is a long-standing part of city, county, and regional transportation plans, and much of the development adjacent to the planned route has been developed with the bypass in mind," and therefore the Bypass "has already had an effect on the location of development."

35.     As regards cumulative impacts, the Draft EIS limited the project areas considered to the Pebble Creek Watershed, even though the northern portion of the Bypass extends beyond that Watershed further into the Fox River Basin. Even within that smaller area, the Draft EIS did not discuss how the Waukesha Bypass fits into the overall cumulative impacts to various resources.

36.     As regards wetlands, the draft EIS recognized that the project will impact more than five acres of wetlands but concluded there will be no significant cumulative impacts on wetlands as long as certain mitigation measures are implemented.

37.     As regards water quality, the Draft EIS recognized the Bypass will increase the impervious area in the watershed, which brings "higher amounts of nonpoint source pollutants and degraded water and fishery quality." The Draft EIS also raised concerns that "the Pebble Creek watershed water quality has diminished through past urbanization and is close to a tipping point of further degradation of water quality," and suggested that future residential development "would continue to push the watershed past the threshold beyond which water quality decreases," including beyond the 10% imperviousness threshold "above which Index of Biotic Integrity scores decline dramatically."

11

38.     Similarly, as regards floodplain impacts, the Draft EIS recognized the project "will add incrementally to the cumulative loss of Pebble Creek floodplain."

39.     With respect to mitigation to minimize adverse environmental impacts, the Draft EIS identified measures that "may be considered" and which will be "refined in the design phase."

40.     As regards natural areas, the Draft EIS recognized the Bypass will impact both the Pebble Creek wetlands and the Pebble Creek Railroad Corridor Prairie, as well as the secondary environmental corridor, including by acquiring land in these important natural areas. The Draft EIS proposed that a separate area will be acquired and preserved as mitigation for the damage done to these areas.

**3.     Public Input On The Draft EIS, Including The Purported "Public Hearing"**

      **a.     Public and Agency Comments**

41.     Numerous comments were submitted raising concerns with the Draft EIS. Among other issues commenters argued that the purpose and need for the project was not properly defined, and that reasonable alternatives were excluded, including whether some combination of alternatives might satisfy the project's legitimate goals. Comments also explained that contrary to the Draft EIS's claim that the project is widely supported, in fact there is large-scale opposition to the project.

42.     Commenters also argued that the Draft EIS had not adequately considered the adverse effects of the Bypass, including indirect and cumulative effects. Commenters similarly explained that the proposed mitigation for the adverse impacts that were recognized in the Draft EIS had not been adequately described or defined.

12

43.    Commenters also explained that the Draft EIS had not properly considered the safety and traffic issues that were being relied upon to justify the project, including by collecting actual empirical data concerning wait times at various intersections, which would show that the wait times assumed in the Draft EIS are inaccurate.   Comments also raised issues not addressed in the Draft EIS, such as whether a four-lane highway would attract more trucks, thereby increasing safety risks.

44.    Among the issues the public asked Defendants to consider was whether the project's purpose could be satisfied with "traffic calming" measures, or an alternative that would create three lanes rather than four, adding a center turn-only lane.

45.    The Coalition Opposed To The West Waukesha Bypass ("Coalition") also proposed a "No-Build Improve" alternative, whereby improvements would be made to County TT to address legitimate safety and traffic concerns, but the road would not be widened.  This alternative included adding some left-turn lanes, adding stop signs or stop lights, reducing speed limits, improving signage, and improving the Madison and County TT intersection to minimize the steep hill there.

46.    The United States Environmental Protection Agency ("U.S. EPA") also raised concerns with the Draft EIS, stating that Defendants must develop concrete mitigation measures and more thoroughly consider certain impact areas.   U.S. EPA was particularly critical of Defendants' plans to defer identification of specific mitigation measures – and, in particular, finalizing a wetland mitigation plan – until the "project design phase," explaining that addressing matters long after the NEPA process is complete "does not allow for public input" in the manner NEPA requires.

13

47. The U.S. EPA letter also questioned Defendants' reliance on highly uncertain impacts to justify their decision-making, such as the assertion that one route "may" be safer than another.

48. The U.S. EPA letter also raised serious concerns with the threats posed by invasive species as a result of the project's use of wetlands, explaining how "just a 'foothold' for some invasives is enough to compromise large portions of certain wetlands." To address this concern U.S. EPA "strongly recommend[ed]" that the agencies implement a non-native species monitoring and eradication plan.

49. The U.S. EPA letter also raised concerns regarding the upland habitat impacts by the project, and urged Defendants to properly mitigate for tree losses that will occur.

50. The U.S. EPA also urged Defendants to address the cumulative floodplain impacts from the project by including consideration of all the "transportation projects listed in the 2035 regional transportation system plan, as well as the WIS 59 widening project . . . and the WIS 83 widening project which will affect one larger floodplain area."

**b.    The "Public Hearing"**

51. On November 13, 2012, Defendants held a four-hour long "hybrid open house" public hearing on the Waukesha Bypass. Three separate activities occurred at the open house, all at the same time. First, agency officials were engaged in one-on-one conversations with members of the public while standing around project displays in a large, noisy room. Second, individuals were providing private testimony before court reporters in one of three separate rooms set up for this purpose. Third, members of the public were providing oral testimony before a panel of agency officials in yet another room. Members of the public participating in

14

the one-on-one conversations or providing testimony did not have the opportunity to hear the public testimony before the panel, and those witnesses did not have the opportunity to have all interested citizens hear what they had to say about the project.

       **4.**      **The Final Waukesha Bypass EIS**

52.      In September 2014, Defendants issued the Final EIS for the Waukesha Bypass, maintaining the original purpose and need for the project. The Final EIS fails to adequately address many of the concerns that had been raised in the comment period and ignores other concerns altogether.

53.      The Final EIS relies on the same conclusions about road safety and traffic conditions that commenters had criticized in the Draft EIS. For example, the Defendants rely on various WisDOT "guidelines" to determine the wait times at intersections, and the maximum inclines necessary to insure the sightlines that protect against crashes, rather than relying on any actual data on these conditions on the existing County TT.

54.      As in the Draft EIS, while the Final EIS identifies several potential alternatives, each is dismissed before any comparison is made among the environmental impacts of alternatives. For most of the road, only the preferred alternative receives "detailed" examination in the Final EIS.

55.      As in the Draft EIS, the Final EIS rejects the non-build alternatives and never considers whether they could be combined with an improved two-lane (or even three-lane) alternative to meet project needs.

15

56.     As to the build alternatives, for most of the length of County TT, only *one* route alternative – along existing County TT – was considered beyond the initial alternative screening process.

57.     The Final EIS rejects the "No Build Improve" alternative on the grounds that it cannot meet the project's purpose and need.  As regards the purpose of carrying out prior plans, the Final EIS concludes that the "No Build Improve" alternative will not satisfy that purpose because it would not result in the long-planned four-lane Highway.  With respect to traffic concerns, the Final EIS concludes that this alternative cannot satisfy coming traffic demand, but does not consider whether those concerns could be addressed with non-build, mass transit, or traffic management measures.  As for safety, although no road safety modeling was done for this alternative, the Final EIS concludes this alternative will not address safety concerns by relying on modeling done for a different two-lane alternative.

58.     The Final EIS does not address whether a four-lane Highway is necessary for the entire length of the project, such as areas where the existing crash rates are lower than the statewide average.  It also relies on speculative assumptions to reject two-lane alternatives on the grounds that they "may" be less safe than four-lane alternatives.

59.     The Final EIS maintains the Draft EIS conclusion that the project will not have significant indirect or cumulative effects because those effects will occur irrespective of construction of the Waukesha Bypass.

60.     The Final EIS also maintains the Draft EIS limitation on consideration of cumulative impacts to the Pebble Creek Watershed, and omits consideration of how the Bypass fits into the overall cumulative impacts on resources.

16

61.     The Final EIS relies on purported mitigation measures to ameliorate adverse impacts to wetlands and other resources, but defers the identification of specific measures and how they will be utilized to the "project design phase."  For example, the Final EIS concludes that various mitigation measures will "prevent thermal impacts from adversely affecting water quality," but those measures, and where they will be used, are not concretely identified. Similarly, the Final EIS provides that dry infiltration ponds and other "best management practices" ("BMPs") will be necessary to protect water quality from thermal impacts, but only identifies "options that may be considered" for these BMPs, which will also be addressed at a later stage.   The validity of relying on these BMPs was not addressed in the Draft EIS.

62.     The Final EIS continues to recognize the water quality risks associated with increased impervious surfaces, but incongruously concludes that the Bypass will not contribute to this problem.  The Final EIS reaches the same conclusion with regard to impacts on the floodplain, but announces – for the first time – that a floodplain modeling effort will occur during the "final design" to "evaluate floodplain impacts at Pebble Creek crossings and other locations where the floodplain will be affected," which will, along with a future "no-rise analysis," provide "the definitive answer as to impacts of the preferred alternative's floodplain impacts on flood hazard."  The agencies also did not conduct the cumulative floodplain impacts analysis recommended by U.S. EPA, or explain the bases for not doing so.

63.     As regards the upland mitigation, the Final EIS asserts that the agencies are continuing efforts to insure adequate mitigation, but makes no mention of involving the public in reviewing or comment on the adequacy of such efforts.

**5.    The Waukesha Bypass ROD**

17

64.     U.S. EPA and others submitted comments in response to the Final EIS, reiterating many of the concerns that had been raised in comments after the Draft EIS was issued, but which had not been addressed in the Final EIS – including each of the concerns discussed above. Among other issues, commenters explained that the Waukesha Town Board had passed a resolution opposing the project and had endorsed the "no build" alternative.

65.     U.S. EPA was particularly concerned about the plans for upland mitigation, explaining that the agencies must provide "[p]ermanent, legal protection of the remaining wooded upland" being considered as a mitigation site, and that "property owner participation in the state forest management program" does not qualify as "permanent, legal protection."

66.     On January 20, 2015 the Defendants issued the Waukesha Bypass ROD. The ROD chooses the preferred alternative from the Final EIS.

67.     The ROD relies on mitigation measures that will be "refined in the design phase." The ROD similarly provides that the project's impacts on flood elevation will not be determined until the "final design phase." As regards wetland mitigation, the ROD states that the agencies are continuing to consider onsite mitigation sites, and leaves open the possibility that no such mitigation site will be protected at all.

68.     The ROD also makes no commitments regarding upland mitigation, other than that the agencies remain "committed to tree mitigation for impacts to the upland forest in the primary environmental corridor south of Sunset Drive." As regards U.S. EPA's comment that the agencies must ensure permanent protection of upland habitat, the ROD provides only that it is the agency's "intent to continue to work with the property owner, within all their available powers, to bring about a solution which will legally protect the remaining woodlands and interior

18

forest habitat," but recognizes that the agencies "cannot force the sale or protection of the property."

## PLAINTIFFS' CLAIMS FOR RELIEF

## CLAIM ONE

### (NEPA and the APA)

69.     By deciding that the Waukesha Bypass would be built long before the EIS was prepared, Defendants have violated NEPA and its implementing regulations and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA.  5 U.S.C. § 706(2)(a).

70.     By relying on the need to fulfill prior transportation plans as a basis to reject project alternatives, while at the same time recognizing that the Bypass does not actually satisfy those plans – because it no longer bypasses developed areas, and does not even follow the planned route south of the Wisconsin and Southern Railroad area –  Defendants have violated NEPA and its implementing regulations and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA.  *Id.*

71.     By defining the purpose and need for the Waukesha Bypass so narrowly that only one alternative could be chosen, Defendants have violated NEPA and its implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA.  *Id.*

72.     By failing to afford serious consideration to alternatives to the Waukesha Bypass, including whether a combination of alternatives might meet the project's legitimate objectives, such as the non-build alternatives or alternatives that would result in a two-lane road remaining

19

in at least parts of the route – as well as the "No Build Improve," three-lane, and other alternatives offered in public comments – Defendants have violated NEPA and its implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. *Id.*

73.     By rejecting the "No Build Improve" alternative on the grounds that it would not satisfy safety concerns without at least modeling road safety for that alternative, Defendants have violated NEPA and its implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. *Id.*

74.     By relying on WisDOT "guidelines" to evaluate existing traffic and safety conditions, rather than empirical data on actual road conditions on County TT, Defendants have violated NEPA and its implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. *Id.*

75.     By improperly discounting the indirect and cumulative effects of the Waukesha Bypass on the grounds that those effects will occur irrespective of whether the road is built, and not considering at all the degree to which other nearby road expansions to four-lanes have spurred commercial development, Defendants have violated NEPA and its implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. *Id.*

76.     By improperly constraining the study area for consideration of cumulative impacts from the Waukesha Bypass to the Pebble Creek Watershed, even though the Bypass

itself extends beyond that Watershed, Defendants have violated NEPA and its implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. *Id*.

77.    By failing to consider cumulative floodplain impacts by including other planned road projects that will affect the overall floodplain area, as urged by U.S. EPA, Defendants have violated NEPA and its implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. *Id*.

78.    By relying on highly speculative and undefined mitigation measures to offset environmental impacts, including "significant cumulative impacts" that will otherwise occur to wetland areas, and otherwise deferring resolution of important environmental impact issues until long after the NEPA process is complete – such as the floodplain impacts, which will not be modeled until the "final design" phase – Defendants have violated NEPA and its implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. *Id*.

79.    By failing to consider whether another alternative may help maintain the level of impervious surface in the area below the ten percent threshold necessary to avoid significant degradation in water quality, Defendants have violated NEPA and its implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. *Id*.

80.    By failing to insure permanent legal protection for the wooded upland that U.S. EPA stated was necessary to sufficiently mitigate the adverse impacts of the project, Defendants

have violated NEPA and its implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. *Id.*

81.     By failing to implement a non-native species monitoring and eradication plan, as also strongly recommended by U.S. EPA, or to at least explain the rationale for not doing so, Defendants have violated NEPA and its implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. *Id.*

82.     By failing to adequately explain the bases for the EIS's exaggerated traffic projections, or its assumptions regarding safety matters, Defendants have violated NEPA and its implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. *Id.*

83.     By failing to adequately respond to public comments on the project, such as the three-lane or traffic calming alternatives, or the impacts of increased truck usage on road safety, or to even allow public comment on important aspects of the project only first revealed when the Final EIS was issued – such as, *inter alia*, the reliance on undefined BMPs to mitigate for thermal impact; the lack of the modeling necessary to determine the project's impacts on the floodplain at the Pebble Creek and other crossings; and the groundwater conditions, which the Final EIS reveals to be quite different than discussed in the Draft EIS – Defendants have violated NEPA and its implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA. *Id.*

84.     These legal violations are injuring Plaintiffs in the manner described in paragraphs 3-6 above.

## CLAIM TWO

(Federal Highways Statutes and the APA)

85.     By failing to demonstrate that there is no "prudent and feasible alternative to" the Waukesha Bypass, Defendants have violated the Federal Highway Statutes, 49 U.S.C. § 303(c); 23 U.S.C. § 138(a), and implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA.  5 U.S.C. § 706(2)(a).

86.     By failing to adequately minimize the Waukesha Bypass's adverse impacts on protected areas, Defendants have violated the Federal Highway Statutes, 49 U.S.C. § 303(c); 23 U.S.C. § 138(a), and implementing regulations, and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA.  5 U.S.C. § 706(2)(a).

87.     By failing to hold a "public hearing" in the manner required by the Federal Highways Statutes, 23 U.S.C. § 128(a), Defendants have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA.  5 U.S.C. § 706(2)(a).

87.     These legal violations are injuring Plaintiffs in the manner described in paragraphs 3-6 above.

Wherefore, Plaintiffs respectfully request that this Court:

1.  declare that the Waukesha Bypass EIS and ROD violates NEPA, the Federal Highways Statutes, and the APA;

2.  set aside and remand the Waukesha Bypass EIS and ROD;

3.  enjoin Defendants from taking any action in furtherance of implementing the Waukesha Bypass EIS and ROD until they come into compliance with Federal Law;

4.  award Plaintiffs their costs and attorneys' fees; and

5.  award such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

*/s/ Eric R. Glitzenstein*
Eric R. Glitzenstein (D.C. Bar. No. 358287)

*/s/ Caitlin Zittkowski*
Caitlin Zittkowski (CA Bar No. 290108)

MEYER GLITZENSTEIN & EUBANKS LLC
1601 Connecticut Avenue, NW, Suite 700
Washington, D.C. 20009
(202) 588-5206 (phone)
(202) 588-5049 (fax)
eglitzenstein@meyerglitz.com

Attorneys for Plaintiffs

24