UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

WAUKESHA COUNTY ENVIRONMENTAL
ACTION LEAGUE; and
COALITION OPPOSED TO THE WEST
WAUKESHA BYPASS, UA,

        Plaintiffs,

                              Case No. 15-cv-801-pp

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION; ANTHONY FOXX, Secretary
of Transportation; FEDERAL HIGHWAY
ADMINISTRATION; GREGORY G. NADEAU, Acting
Administrator, Federal Highway Administration;
and DAVE ROSS[1], Secretary of the State of Wisconsin
Department of Transportation,

        Defendants.

---

**ORDER DENYING PLAINTIFFS' APPEAL OF AGENCY
DECISION (DKT. NO. 27) AND DISMISSING CASE**

---

        "The West Waukesha Bypass"—a highway construction project

contemplated by Waukesha County since as early as 1951—is a misnomer.

Due to the area's development, the "bypass" would no longer "bypass" the city,

but would be an "arterial roadway"[2] on the west side of Waukesha. After

---

[1] Dave Ross succeeded Mark Gottlieb as Secretary of the Wisconsin
Department of Transportation on January 7, 2017; the court substituted Dave
Ross as a party on January 20, 2017.

[2] Neither party disputes the characterization of the project as an arterial
roadway. Neither party, however, defines this phrase in briefs, and it is not
defined in the administrative record. Merriam Webster's Online Dictionary

1

several years of review, the project gained the necessary agency approvals to begin construction—only this case remains. The plaintiffs have asked this court to review the project's approval, claiming that the defendants "bypassed" various procedural requirements. The court will deny the plaintiffs' request and dismiss the case.

## I.  FACTUAL BACKGROUND

This highway project is colloquially known as the "West Waukesha Bypass." Final Environmental Impact Statement ("Final EIS") §1.1.1 at AR1059. The project involves the construction of an "arterial roadway" on the west side of the City of Waukesha, in a "project corridor" running north-south between Rolling Ridge Drive on its northern end and the intersection of Wisconsin Highway 59 and County Highway X on its southern end. Id.; Dkt. No. 37 at 1-2. The project corridor consists of roadways with varying characteristics, including "substandard hills and curves, high number of access points, narrow shoulders, and substandard stopping sight distance and intersection sight distance. . . ." Final EIS §1.4 at AR1085. Because "[t]he gap in the circumferential route around the city of Waukesha creates increased demand on project area roads and impedes the flow of people and goods into and out of the area," the defendants proposed to build a "more reliable north-south arterial on the west side of Waukesha . . . to connect the area south of Waukesha with I-94." Id.

_____

defines "arterial" as "of, relating to, or constituting through traffic." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/arterial (last visited Oct. 18, 2018).

On May 11, 2010, the Federal Highway Administration ("FHWA") announced that, in conjunction with the United States Department of Transportation ("USDOT"), the Wisconsin Department of Transportation ("WisDOT") and the Waukesha County Department of Public Works, it would prepare an Environmental Impact Statement ("EIS") for the proposed project. Dkt. No. 31 at 11. The agencies released a Draft EIS on October 12, 2012, after "open house public information meetings" in May, July and August of 2010 and February of 2011. Dkt. No. 37 at 7; Draft EIS at AR70. The Draft EIS stated:

> The purpose of the West Waukesha Bypass is to provide a safe and efficient north-south arterial roadway on the west side of the City of Waukesha to complete the long-planned circumferential route around Waukesha; to accommodate growing traffic volumes along the corridor; and to improve roadway deficiencies that include tight curves, steep hills, narrow lanes, and lack of shoulders. The proposed improvements address two major needs:
>
> > Improve safety by providing a roadway that meets current design standards.
> > Accommodate traffic demand generated by existing and planned development within and outside the study corridor.
>
> The need for the proposed action is demonstrated through a combination of factors that include project history, regional/ local transportation and land-use planning, traffic demand, safety concerns, existing roadway deficiencies, system linkage, and environmental aspects.

Draft EIS at AR66.

After release of the draft EIS, the defendant agencies held a hearing at Waukesha North High School from four p.m. to eight p.m. on November 13,

2012. Final EIS §6.1 at AR1460. "The public hearing was a hybrid of the open house and formal hearing formats." Id. More specifically,

> Representatives from WisDOT [the Wisconsin Department of Transportation], Waukesha County, and the consultant team were available to review project alternatives, listen to comments, answer questions, and explain procedures for providing testimony. At 5 p.m., the hearing chairman convened a formal hearing in the school auditorium. Three formats were available for providing testimony at the hearing: public testimony to a panel of project representatives in the auditorium, private oral testimony to court reporters, and written comment forms, letters, or e-mail. Comment forms or letters could also be mailed after the public hearing, or comments could be e-mailed to the project's e-mail address. . . . All forms of testimony were given equal consideration. The duration of the comment period for the Draft EIS was October 26 to December 10, 2012.

Id.

In September 2014, the defendants issued the project's Final EIS. Final EIS at AR1021. The project's purpose and need statement remained the same in the Final EIS as in the Draft EIS. Dkt. No. 31, at 13; compare Draft EIS at AR66 with Final EIS at AR1026. The Final EIS chose and analyzed the "preferred alternative" from the Draft EIS for the project: a "4-lane divided TT2 Alignment between I-94 and the Wisconsin and Southern Railroad and the 4-lane divided Pebble Creek West Alternative between the railroad and WIS 59." Final EIS §2.6, at AR1137. Using the Final EIS, the defendants issued a Record of Decision ("ROD") on January 20, 2015 which selected this "preferred alternative" for the construction of the project. Dkt. No. 31 at 13; ROD at AR3.

A year later, in 2016, the defendants proposed to redesign a portion of the project. Dkt. No. 37 at 10. The re-design sought to shift a segment of the

project's alignment to avoid impacting a wetland. Id. To analyze the environmental effects of this proposed new alignment—called the "Rotated Pebble Creek West" alternative—the agencies produced and released a reevaluation document on July 22, 2016. Id. In the reevaluation, the defendants concluded that a supplemental EIS was unnecessary:

> All resource studies undertaken as part of the final EIS included the location of the Rotated Pebble Creek West alignment which is located between the Pebble Creek West and Pebble Creek Far West alternatives. Even though resource studies did not contemplate the Rotated Pebble Creek West alignment, the studies were re-evaluated to a level that supports their sufficiency in concluding that there are no new significant impacts as a result of the rotated alignment.

Reevaluation at 16, at AR29873.

## II.     PROCEDURAL HISTORY

On July 2, 2015, plaintiffs Waukesha County Environmental Action League and Coalition Opposed to the West Waukesha Bypass, UA filed this lawsuit for declaratory and injunctive relief against the above-named defendants. Dkt. No. 1. On December 15, 2015, Judge Rudolph T. Randa (to whom the case originally was assigned) conducted a scheduling conference in which the parties "agree[d] to handle the case as an administrative appeal and dispense with summary judgment format . . . ." Dkt. No. 14 at 1. On November 27, 2016, the plaintiffs filed an amended complaint, adding allegations pertaining to the project's 2016 re-design. Dkt. No. 27. The amended complaint asked the court to: (1) declare that the Final EIS, the ROD and the reevaluation violate the National Environmental Policy Act ("NEPA"), the Federal-Aid

Highways Act, the Endangered Species Act ("ESA"), and the Administrative Procedure Act ("APA"); (2) set aside and remand the Final EIS, the ROD and the reevaluation; (3) enjoin the defendants from taking any action in furtherance of implementing the Final EIS, the ROD, and the reevaluation until they come into compliance with federal law; and (4) award plaintiffs their costs and attorney's fees. Id. at 35.

The plaintiffs filed a fifty-page brief in support of their positions on December 16, 2016. Dkt. No. 31. On January 20, 2017, the defendants filed two separate opposition briefs—one by defendant Mark Gottleib (now Dave Ross), Dkt. No. 36, and one by the remaining "federal defendants." Dkt. No. 37. The plaintiffs filed a reply on February 20, 2017. Dkt. No. 38. Three months later, the plaintiffs filed a document titled "Plaintiffs' Notice of Project Construction Activities and Request for an Expedited Ruling." Dkt. No. 40. This motion stated that the Wisconsin Department of Transportation had started construction activities on the northern end of the project, and urged the court "to issue a ruling on the merits of Plaintiffs' NEPA claim as expeditiously as the Court's schedule permits." Dkt. No. 40 at 1-2. The court heard oral argument on July 11, 2017. Dkt. No. 43. It has taken the court time to issue its ruling, which spurred the plaintiffs to file two further documents: (1) a "notice regarding status of work on project and request for a ruling," dkt. no. 44; and (2) an unopposed motion for a telephonic status conference to ask for emergency injunctive relief, dkt. no. 45.

# III.   DISCUSSION

### A.   Standard of Review

At the initial scheduling conference, the parties agreed to forego the summary judgment process, and asked the court to review the findings of the administrative agency. Dkt. No. 14. The APA governs a district court's review of agency action under NEPA, Ind. Forest All., Inc. v. U.S. Forest Serv., 325 F.3d 851, 858 (7th Cir. 2003), and requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). The Supreme Court has explained that

> in making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'

Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 379 (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).

A reviewing court makes two inquiries: "1) whether the agency's decision was based on a consideration of the relevant factors; and 2) whether the agency has made a clear error in judgment." Envtl. Law & Policy Ctr. v. U.S. Nuclear Regulatory Comm'n, 470 F.3d 676, 682 (7th Cir. 2006). A court "cannot substitute its own judgment for that of the agency as to the environmental consequences of its actions. In fact, in applying the arbitrary and capricious

standard, this Court's only role is to ensure that the agency has taken a hard look at environmental consequences." Id. (internal citations omitted).

"'If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference.'" Highway J Citizens Grp. v. Mineta, 349 F.3d 938, 953 (7th Cir. 2003) (quoting Ind. Forest All., 325 F.3d at 859).

"NEPA 'does not mandate particular results, but simply prescribes the necessary process.'" Id. (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989)). A reviewing court "is not empowered to examine whether the agency made the 'right' decision, but only to determine whether, in making that decision, the agency followed the procedures prescribed by NEPA." Habitat Educ. Ctr., Inc. v. U.S. Forest Serv., 593 F. Supp. 2d 1019, 1024 (E.D. Wis. 2009) (citing Mineta, 349 F.3d at 952)).

> [A] court must be careful not to "'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor." *Nat'l Audubon Soc'y [v. Dep't of the Navy],* 422 F.3d [174,] . . . 186 [(4th Cir. 2005)]. With a document as complicated and mired in technical detail as an EIS, it will always be possible to point out some potential defect or shortcoming, or to suggest some additional step that the agency could have taken to improve its environmental analysis. An EIS is unlikely to be perfect, and setting aside an EIS based on minor flaws that have little or no impact on informed decision-making or informed public participation would defy common sense. Thus, rather than getting bogged down in possible technical flaws, a court must "take a holistic view of what the agency has done to assess environmental impact." *Id.* Further, courts must remember that it is the agency, and not the court, that has the technical expertise required to

perform the environmental analysis in the first place. This means that judicial review of an EIS must be deferential, especially when it comes to the scientific and technical details that make up the heart of the analysis.

Habitat Educ. Ctr., 593 F. Supp. 2d at 1025.

B.    Discussion

*1.   The "public hearing" requirement under 23 U.S.C. §128*

The plaintiffs allege that under the Federal-Aid Highways Act, Title 23 United States Code §128, the defendants failed to provide a "public hearing" prior to the project's approval. Dkt. No. 31 at 17. They assert that the format of the hearing in November of 2012 (referred to by the parties as a "hybrid hearing") did not "provide the 'direct link between the public and government representatives that Congress envisioned.'" Id. at 18 (quoting Highway J Citizens Grp. v. U.S. Dep't of Transp., 656 F. Supp. 2d 868, 884-85 (E.D. Wis. 2009)).

Specifically, the plaintiffs contend that the hybrid meeting undermined the purpose of a "public hearing" by diluting the opportunities for one citizen to learn about the views of a fellow citizen. Id. at 18. They say that some members of the public missed their opportunity to hear other citizens' viewpoints because the hybrid hearing intentionally set up different testimonial activities at the same time. Id. at 18-19. And, plaintiffs claim, citizens should not have had to make the choice between testimonial activities. Id. They cite Highway J, 656 F. Supp. 2d at 897, in which a court in this district held that a purely

"open house"-style forum did not qualify as a "public hearing" under 23 U.S.C. §128.

The defendants respond that the <u>Highway J</u> decision considered only whether "open house"-type hearings could satisfy the "public hearing" requirement of 23 U.S.C. §128. Dkt. No. 37 at 11. They contend that because they conducted a *hybrid* hearing—more than just an "open house"—the 2009 <u>Highway J</u> decision does not compel the court to set aside the agency's decision. <u>Id.</u> The defendants characterize the hybrid hearing as "supplementing the town hall format with other methods of public comment[,]" and argue that "any person who wished to hear the publicly-presented testimony could do so without losing the opportunity to provide testimony in writing or privately." <u>Id.</u> at 11-12.

The Federal-Aid Highways Act imposes requirements on state agencies that apply to receive federal funding under this statute. Section 128 of the Act requires that

> [a]ny State transportation department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, *shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings,* and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community.

23 U.S.C. §128 (emphasis added).

The plaintiffs correctly note that the statute does not define a "public hearing," or prescribe a necessary format. Dkt. No. 31 at 17; citing Highway J, 656 F. Supp. 2d at 895. The implementing regulation, 23 C.F.R. §771.111(h)(2)(vii), requires only "an opportunity for public involvement in defining the purpose and need and the range of alternatives."

In Highway J Citizens Grp. v. U.S. Dep't of Transp. et al, Judge Adelman considered whether the WisDOT's "open house" qualified as a "public hearing" under 23 U.S.C. §128. Highway J, 656 F. Supp. 2d at 894-97. For that project, the

> WisDOT held an 'open house.' It held this open house at a local church over the course of seven hours. WisDOT provided attendees with a handout 'that included a summary of project purpose and need; alternatives and their impacts; information about upcoming activities and contacts; frequently asked questions and responses; and a comment form.' Attendees could also walk around the room and view exhibits about the project. Representatives from WisDOT attended the open house and 'were available to explain project alternatives, answer questions, and explain procedures for providing testimony.' However, the format that WisDOT used did not permit members of the public to publicly express their views directly to WisDOT representatives or to other members of the public. Rather, WisDOT required those who wished to express an opinion or make a suggestion to either dictate their comments in private to a court reporter or complete written comment forms.

Id. at 895 (record citations omitted).

In his analysis, Judge Adelman found that "a public hearing must allow citizens an opportunity to express their views in front of agency representatives and other citizens." Id. at 896. He concluded "[t]he open house held by WisDOT did not afford such an opportunity," because "it offered no opportunity for one

citizen to learn about the views of a fellow citizen, no opportunity for one citizen to influence another." Id.

In contrast, the hybrid hearing in this case afforded citizens the opportunity to influence one another in the auditorium forum setting. Section six of the Final EIS details the November 13, 2012 proceedings. Final EIS at §6.1; AR1460. The event lasted from four p.m. until eight p.m., and at five p.m., the hearing's chairman convened "a formal hearing in the school's auditorium" where citizens provided "public testimony to a panel of project representatives." Id. The plaintiffs do not argue that the agencies barred any members of the public from attending this auditorium hearing. Rather, they argue that by hosting other activities at the same time as this auditorium hearing, the citizens who attended the auditorium hearing lost the opportunity to influence a fellow citizen who chose to be in another room.

Neither the statute, the implementing regulation, nor Judge Adelman's Highway J decision provide citizens with a right to influence all other interested citizens. Judge Adelman's decision held only that the procedure must give citizens "an *opportunity* to express their views in front of agency representatives and other citizens." 656 F. Supp. 2d at 896 (emphasis added). Here, interested citizens had just such an opportunity; the auditorium hearing gave interested citizens the opportunity to influence the agency representatives and those other individuals who chose to attend the auditorium hearing. The fact that one or more citizens chose to attend other presentations going on at the same time does not change the fact that they had the opportunity to attend the

auditorium hearing. The answer to the question of whether the defendants held a "public hearing" does not turn on whether anyone chooses to attend that hearing—the question is whether they had the opportunity to do so. The hybrid hearing qualified as a "public hearing."

2.      *The final EIS's definition of the project's purpose*

The plaintiffs next argue that the defendants violated NEPA by using the process of creating an EIS only to justify an earlier plan, instead of aiding in agency decision-making. Dkt. No. 31 at 22. They argue that the defendants eliminated all the two-lane alternatives (thus removing them from further environmental scrutiny) for the project's northern section solely because those alternatives did not comport with decades-old transportation plans. Id. at 20. This, the plaintiffs contend, shows that the Final EIS defined the purpose and the need of the project so narrowly so that only the desired, four-lane alternative fit its requirements. Id. at 21.

The defendants respond that the project's history constituted only *part* of their decision to eliminate the two-lane alternatives. Dkt. No. 37 at 13 (emphasis added). They assert that other factors included "regional/local transportation and land use planning, traffic demand, safety concerns, existing roadway deficiencies, system linkage, and environmental aspects." Id. (citing Final EIS §1.3, at AR1061).

The defendants also argue that the plaintiffs view the project in a vacuum; the Southeastern Wisconsin Regional Planning Commission has included some form of this bypass in its regional Transportation Improvement

13

Program since 1974. Id. (citing Final EIS §1.3, at AR1061). The defendants state that this commission develops these programs to ensure a comprehensive and coordinated approach to local, regional and state transportation planning, and that NEPA does not require the agencies to analyze their project without regard to these planning activities. Id. at 14. The defendants also cite cases where courts have upheld Environmental Impact Statements whose primary purposes and needs focused on transportation and safety issues. Id. at 14-15 (collecting cases).

For each two-lane alternative, the agencies listed several reasons beyond the project's history as justifications for their rejection. See Final EIS §2.3.1—2.3.3, at AR1107-08; Final EIS §2.4.2.1 – 2.4.2.4, at AR1116-1122 (e.g. at AR1118: "The [2-Lane on Existing Alignment with Limited Intersection Improvements Alternative] was eliminated because it would not adequately accommodate future traffic volumes, would not be as safe as the off-alignment alternatives, would displace more homes than the 2-Lane Off-Alignment Alternative, and has less support than the other alternatives."). This court must accept those reasons at face value; a reviewing court's role is not to question the listed reasons of the agency. In re Subpoena Duces Tecum Served on Office of Comptroller of Curency, 156 F.3d 1279, 1279-80 (D.C. Cir. 1998) ("When a party challenges agency action as arbitrary and capricious, the reasonableness of the agency's actions is judged in accordance with its stated reasons."); see also Spiller v. White, 352 F.3d 235, 242 (5th Cir. 2003).

Further, in the Final EIS, the agencies detailed the different considerations underlying the project's purpose and need. Final EIS at §1.3. Those considerations included project history (§1.3.1), transportation and land use planning (§1.3.2), traffic demand (§1.3.3), truck traffic (§1.3.4), highway capacity (§1.3.5), safety (§1.3.6), roadway characteristics and deficiencies (§1.3.7), system linkage (§1.3.8), and environmental and socioeconomic aspects (§1.3.9). Final EIS §1.3, at AR1068-1085. Taking into account all of these considerations, the agencies found that "[a] more reliable north-south arterial on the west side of Waukesha is necessary to connect the area south of Waukesha with I-94." Final EIS §1.4 at AR1085.

The defendants both (a) considered more than just the project's history in defining their purpose and need and (b) rejected the two-lane alternatives for many reasons, not just because they did not comport with old transportation plans. The plaintiffs disagree with the agencies' conclusions, but the agencies' definition of the project's purpose and need does not constitute clear error. See Envtl. Law & Policy Ctr., 470 F.3d at 682.

### 3. *Considering a combination of alternatives*

The plaintiffs next allege that by failing to consider whether a combination of alternatives might meet the project's legitimate objectives, the defendants violated NEPA. Dkt. No. 31 at 23. The plaintiffs state that while the defendants rejected "non-build" alternatives because those alternatives wouldn't *individually* address safety and traffic demand concerns, they failed to (and needed to) consider whether some combination of those measures could,

together, achieve the project objectives. Id. at 23-24 (emphasis added). They list two cases discussing the failure to consider a combination of alternatives: Davis v. Mineta, 302 F.3d 1104, 1122 (10th Cir. 2002) and Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1170-71 (10th Cir. 2002).

The defendants counter that they were obligated only to evaluate all *reasonable* alternatives, and that an alternative is reasonable only if it will bring about the end of the federal action. Dkt. No. 37 at 16 (emphasis added). They argue that they did not have to analyze every conceivable alternative action in the EIS. Id. at 17-18 (citing City of Carmel-By-The-Sea v. U.S. Dep't of Transp., 123 F.3d 1142 (9th Cir. 1997) ("The Environmental Impact Statement need not consider an infinite range of alternatives, only reasonable or feasible ones.")).

NEPA established the Council on Environmental Quality ("CEQ") to promulgate regulations implementing the statute. See 42 U.S.C. §4342. One such regulation, 40 C.F.R. §1502, prescribes the required contents of an EIS. That section mandates that "agencies shall: (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. §1502.14. While alternatives analysis is "the heart of the environmental impact statement[,]" 40 C.F.R. §1502.14, "[a]gencies are not required to consider alternatives that would not serve the reasonable project purpose." Coalition to Protect Cowles Bog Area v. Salazar, No. 2:12-CV-515, 2013 WL 3338491, at *11 (N.D. Ind. July 2, 2013). The Seventh Circuit

has further elaborated that "[a]n agency is required to address three questions in considering alternatives. 'First, what is the purpose of the proposed project (major federal action)? Second, given that purpose, what are the reasonable alternatives to the project? And third, to what extent should the agency explore each particular reasonable alternative?'" Mineta, 349 F.3d 938 at 960-61 (quoting Simmons v. United States Army Corps of Eng'rs, 120 F.3d 664, 668 (7th Cir. 1997)).

As recounted above, the agencies proffered a two-pronged purpose for the project: (1) improve safety by providing a roadway that meets current design standards; and (2) accommodate traffic demand generated by existing and planned development within and outside the study corridor. Final EIS §1.2 at AR1060. Section two of the Final EIS contains the agencies' discussion of proposed alternatives and lists reasons as to why agencies found them not to meet the project's purpose. Final EIS §2 at AR1100-78. Among others, the agencies screened a "No-Build" alternative, a "Transportation Demand Management" ("TDM") alternative, a "Transportation System Management" ("TSM") alternative, and a "No-Build-Improve" alternative in the Final EIS §§2.3.1, 2.3.2, 2.3.3, and 2.4.1.4 at AR1107-08; AR1115.

The "No-Build" alternative would have involved "[r]outine maintenance" and "would have [had] minimal environmental effects and construction cost." Final EIS §2.3.1 at AR1107. The agencies dismissed it as a reasonable course of action, however, because it would not "address project purpose and need

with respect to safety concerns, existing highway deficiencies, and future traffic demand." Final EIS §2.3.1 at AR1107.

The "TDM" alternative discussed various forms of proposed public transit systems, including a commuter rail system from Oconomowoc to Milwaukee, a potential light-rail/bus guideway from Waukesha to Milwaukee, and increased freeway and non-freeway bus routes. Final EIS §2.3.2 at AR1107. In laying out this alternative, the agencies reasoned that even with the proposed increase in public transit, traffic volumes in the study area were expected to increase twenty-three to fifty-six percent by 2035, and some segments of County TT already carried more traffic than they were designed to handle. Id. The agencies concluded that "the TDM Alternative alone would not fully address project purpose and need with respect to safety concerns, existing highway deficiencies, and future traffic demand. Therefore the TDM Alternative is not considered a reasonable course of action and has been eliminated from consideration as a stand-alone alternative." Id.

The TSM alternative included implementing "coordinated signal timing" and turn lanes. Final EIS §2.3.3 at AR1108. The Final EIS stated that "Waukesha County has implemented several TSM measures in and adjacent to the project area . . . ." Id. But, like the previous alternatives, the agencies concluded that "the TSM Alternative alone would not fully address project purpose and need with respect to safety, existing deficiencies, and future traffic demand. Therefore, the TSM Alternative is not considered a reasonable course

of action and has been eliminated from consideration as a stand-alone alternative." Id.

The "No-Build Improve" alternative sought to "maintain two lanes along the entire route within the current two lane footprint." Final EIS §2.4.1.4 at AR1115. Its most significant improvements proposed adding left turn lanes where needed; adding stop signs/lights, reducing speed limits and improving signage where needed for safety reasons; and improving the Madison/County TT intersection to minimize the steep hill before the stop sign. Id. The defendant agencies rejected this alternative for three reasons: (1) it would not meet all minimum standards along the length of the alternative; (2) it would not accommodate growing traffic volumes along the corridor; and (3) "it would not be as safe as the other 2-lane alternatives or the 4-lane roadway because intersections would not be improved to the same extent and the roadway may not uniformly meet WisDOT's minimum 2-lane standards." Id. at AR1121.

The defendants properly outlined the reasonable alternatives and stated the reasons why each proposed alternative would not meet the project's purposes and needs. The CEQ regulations mandate only that agencies "briefly discuss" why they dismissed the alternative as unreasonable. 40 C.F.R. §1502.14. The EIS provided those brief discussions.

Despite the extensive administrative record, the plaintiffs insist that the defendants should have "consider[ed] whether traffic growth concerns could be met by implementing one or more non-build alternatives or two-lane alternatives for at least parts of the route, along with the 'No-Build Improve,'

three-lane and other alternatives offered in comments." Dkt. No. 31 at 24. They rely on two cases from the Tenth Circuit to support their argument that the defendant agencies must consider alternatives in combination.

The project at issue in <u>Davis v. Mineta</u>, 302 F.3d 1104 (10th Cir. 2002) involved "the creation of a new freeway interchange at Interstate 15 and 11400 South; the construction of a new bridge over the Jordan River at 11400 South; and the widening and extension of existing 11400 South." <u>Id.</u> at 1110. The Tenth Circuit found that the agencies erred in failing to consider whether TSM and/or mass transit could, together with alternative road transit, meet project goals. <u>Id.</u> at 1121-22. The Tenth Circuit noted that various reports in the record found (a) that "TSM could significantly contribute to traffic management in the area," and (b) that "mass transit in any number of iterations is apparently under active consideration in this area by a number of jurisdictions involved." <u>Id.</u> at 1122. The court concluded that the record did not demonstrate that those options were too "remote, speculative, impractical or ineffective" so as to be considered unreasonable. <u>Id.</u> Instead, those options required more detailed analysis. <u>Id.</u>

In the second case, <u>Utahns for Better Transp. v. U.S. Dep't of Transp.</u>, 305 F.3d 1152 (10th Cir. 2002), the project plan "call[ed] for improving and expanding Interstate 15, expanding transit, and constructing the Legacy Parkway." <u>Utahns</u>, 305 F.3d at 1161. The Tenth Circuit found the agencies' Final EIS inadequate because it failed to take "a hard look at whether public transit could alleviate the immediacy of the need for the I-15 expansion or

Legacy Parkway construction." Id. at 1170. The court found that public transit could not be dismissed as speculative or ineffective when the Final EIS itself relied on public transit "to meet 12 percent of the 2020 demand and maybe the additional 10 percent of demand that will not be met under the Shared Solution." Id.

The Tenth Circuit also found that the Final EIS "fail[ed] to consider integrating the construction of the Legacy Parkway with the expansion of public transit as a reasonable alternative." Id. at 1170. It said that the agencies had not responded to comments in the record by the Federal Transit Administration and others that discussed the significant savings to be gained by building the Legacy Parkway and expanding public transit simultaneously. Id. at 1170-71. Thus, failing to consider the combination of public transit and Legacy Parkway construction rendered the Final EIS inadequate. Id. at 1171.

In both cases, Tenth Circuit found that the record supported the proposed alternatives as being potentially effective in remedying the project's purpose and need. It concluded that failing to further study such promising alternatives alone or in combination rendered the environmental documents inadequate. Davis 302 F.3d at 1122; Utahns for Better Transp., 305 F.3d at 1171.

That is not the case here. Here, the record shows that the plaintiffs' proposed alternatives would be *ineffective* in fulfilling the project's purpose and need. Nothing indicates that a combination of the alternatives would adequately address the project's purpose and need. Without grounds in the

record for concluding that some combination of alternatives might be effective, the court finds that the defendants' failure to consider a combination of individually ineffective alternatives did not constitute clear error in violation of the CEQ regulations.

        *4.      The need for a four-lane highway along the entire project length*

The plaintiffs note that for a stretch of the project—from Rolling Ridge Drive proceeding southward to Summit Avenue—the Final EIS states that the crash rates are lower than the statewide average. Dkt. No. 31 at 24. Accordingly, they argue that safety concerns cannot justify a four-lane highway for this stretch of road. <u>Id.</u> Because alternative plans could address traffic concerns for this stretch of road, plaintiffs allege that the Final EIS failed to explain why a four-lane highway is necessary along this stretch. <u>Id.</u> at 25.

 Section 2.4.2 of the Final EIS explained that a transportation firm, Strand Associates, conducted a "Road Safety Audit" on the project corridor for the WisDOT in 2011. Final EIS, §2.4.2 at AR1116. The Road Safety Audit evaluated crash risks for the two-lane and four-lane alternatives, and concluded that:

> [e]xpanding intersections to provide four through lanes to meet operations criteria would result in a corridor that frequently expands from two lanes to four, only to taper back to two lanes. *The frequent tapers and route inconsistency could increase the risk of crashes compared to a consistent 4-lane corridor, particularly for unfamiliar drivers.*

Final EIS §2.4.2 at AR1118 (emphasis added). Contrary to the plaintiffs' assertions, the agencies listed a reason for selecting a four-lane option for the

entire stretch of project corridor. The court does not find clear error in the agencies' reliance on this finding to justify four lanes along the entire corridor.

### 5. The "No Action" alternative

The plaintiffs argue that the Final EIS arbitrarily and capriciously rejected the "No Action" alternative by failing to provide evidence establishing the need for any action at all. Dkt. No. 31 at 25. The plaintiffs maintain that an EIS must "'articulate a reason for its action that demonstrates a 'rational connection between the facts found and the choice made,'" by "cogently explaining why it has exercised its discretion in a given manner." Id. at 25-26 (quoting Owner-Operator Indep. Drivers Ass'n., Inc. v. Fed. Motor Carrier Safety Admin., 656 F.3d 580, 588 (7th Cir. 2011)).

The plaintiffs say that the Final EIS assumes longer traffic delays on County TT than actually exist, and argue that the FHWA received comments suggesting that Highway TT does not fit the characteristics of a low "Level of Service" road. Id. at 26. The plaintiffs also fault the Final EIS for not discussing the possibility of increasing speed limits and not addressing whether the existing hills in fact correlate with increased accidents in the area. Id. at 27.

The defendants respond that they used standard procedures to evaluate current and future traffic and safety data. Dkt. No. 37 at 19. They note that they are under no obligation to take user experience into consideration. Id.

At §1.3.5.1, the Final EIS discussed the guidelines and the methodology behind assigning a highway a particular "Level Of Service" rating. Final EIS §1.3.5.1 at AR1069. The record shows that various parameters factor into the

Level of Service calculation, such as "[average daily traffic] volumes, peak-hour volumes, truck percentages, number of driving lanes, lane widths, vertical grades, passing opportunities, presence or absence of traffic signals, and access type/spacing." Id. As the defendants note, the court is not a professional transportation analyst. It declines to critique the agencies' methodology in reaching its Level of Service determination.

The Final EIS also discusses the roadway's characteristics and deficiencies. Final EIS §1.3.7 at AR1077. It specifically mentions that "the project corridor has 19 hills that exceed WisDOT's maximum desired grade of 5% for rural arterials . . . [a]ll 10 locations on County TT that exceed the recommended maximum grade also have crash rates that exceed the statewide average rate." Id. at AR1079.

The court cannot conclude that the agencies arbitrarily and capriciously dismissed the no-action alternative on safety grounds. The court's role is only to ensure that the agencies took a "hard look" at environmental consequences, not to act as a transportation data analyst. See Mineta, 349 F.3d at 953. The record reflects that the agencies conducted safety analyses using empirical data. See Final EIS §1.3.5 at AR1069-1079. The record also shows that the agencies used the Road Safety Audit to evaluate the relative safety implications of different alternatives. Id. That audit included a site visit, a Crash Risk Assessment Workshop and an analysis using Hi-Safe software to make quantitative predictions. See AR29376-29397-9. Because the agencies made a

considered decision to reject the no-action alternative, the court will not second-guess its wisdom on this narrow scope of review.

6.     *The "No-Build Improve" alternative*

The plaintiffs argue that the Final EIS rejected the "No-Build Improve" alternative on safety grounds without conducting modeling for this alternative. Dkt. No. 31 at 27. They assert that the defendants arbitrarily and capriciously rejected the "No-Build Improve" on safety grounds. Id. at 27-28. The plaintiffs also assert that the Final EIS did not address the Environmental Protection Agency's ("EPA") concerns with the Draft EIS regarding the no-build improve safety discussion. Id. at 28.

The defendants respond that the Road Safety Audit in the Final EIS evaluated a two-lane alternative that was similar enough to the No-Build Improve alternative to support the agencies' analyses and conclusions. Dkt. No. 37 at 20; see Final EIS §2.4.2.4 at AR1121-22. As for the EPA's concerns, the defendants note that the EPA recommended an estimate of projected crash rates, and that the agencies added estimated crash rates to the traffic safety discussion in Section 3.5.2 of the Final EIS. Id. at 9; see AR1209-14.

The Final EIS states that "[t]he [Road Safety Audit] did not analyze the No Build Improve Alternative. However, the alternative is similar to the 2-lane On Alignment Alternative and would be expected to share its crash characteristics . . . ." Final EIS §2.4.2.4, at AR1120-22. The plaintiffs are correct that the FHWA did not include the "No-Build Improve" alternative in the Road Safety Audit, but they offer no argument as to why the "No-Build

Improve" alternative would differ significantly from the "2-Lane, On-Alignment" alternative. The plaintiffs cite Highway J, in which Judge Adelman concluded that an agency must either model an alternative "to confirm their suspicion that it is not different from another alternative or *explain the basis for not doing so*." Highway J, 656 F. Supp. 2d at 891 (emphasis added). Here, the defendants *did* explain their reasoning: they expected the "No-Build Improve" alternative to share the same crash characteristics as the "Two-Lane, On-Alignment" alternative. Final EIS §2.4.2.4 at AR1121-22. The plaintiffs articulated their reasoning and the court does not find clear error in this decision.

### 7. *Indirect and cumulative impacts of the project*

The plaintiffs argue that the "hard look" required by NEPA must include a discussion of the indirect impacts of the project. Dkt. No. 31 at 30. They assert that the Final EIS's conclusory dismissal of the project's indirect impacts was deficient, because it did not take into account the incremental impact that the highway expansion would have on urbanization and development in the area. Id. at 32.

As for cumulative impacts, the plaintiffs allege that the Final EIS didn't consider commercial development, air quality or noise impacts and instead summarily stated that there would be no cumulative impacts associated with the project. Id. (citing Final EIS §3.4.4 at AR1199). The plaintiffs state that the Final EIS impermissibly ignored whether alternative plans may keep Pebble Creek's "directly connected imperviousness" below 10%, the threshold after which the index of biotic integrity scores decline dramatically. Id. at 33.

Under CEQ regulations, indirect impacts are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. §1508.8. Cumulative impacts, on the other hand, regard "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. §1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." Id.

While the plaintiffs contend that the defendants abdicated their duty to examine indirect impacts, the record does not support that contention. The Final EIS §3.3, at AR1187-1195 discusses: (a) that surrounding land in the Pebble Creek corridor is either wetland or floodplain (or both) and, therefore, is protected by floodplain and shoreland-wetland zoning (AR1194); (b) how the project would induce primarily residential growth, and that residential development already had occurred in anticipation of the project (AR1195); (c) how environmental features limit areas for residential or commercial development (AR1195) and (d) that "the overall air quality should improve because of reduced idling times." AR1193. Given these efforts to determine the project's indirect and cumulative effects, the court cannot conclude that the defendants deficiently scrutinized the project.

The agencies also considered water quality in the Final EIS at Section 3.4.6; regarding the plaintiffs' argument, it concluded:

> Waukesha County determined that the direct connected imperviousness in 2010 without the preferred alternative was 8.7

> percent and with the preferred alternative it would be 9 percent. By remaining below the 10 percent threshold described in the Pebble Creek Watershed Protection Plan, it is reasonable to expect that the Waukesha Bypass' preferred alternative would not adversely affect water quality in Pebble Creek to an extent that it would adversely affect the health of the creek's fishery.

Final EIS, §3.4.6 at AR1201-02. The defendants *did* compare the preferred alternative against a no action alternative about water quality. NEPA does not impose substantive requirements requiring the agency to choose the alternative with the least water quality impact. Mineta, 349 F.3d at 953. NEPA imposes procedural hurdles that, in these regards, the defendants satisfied.

8.      *Scope of the study area for cumulative impacts analysis.*

The plaintiffs contend that the Final EIS improperly constrained the study area surveyed for cumulative impacts analysis. Dkt. No. 31 at 34. The plaintiffs point to a 1997 CEQ Guidance statement which instructed that "cumulative effects analysis should be conducted on the scale of human communities, landscapes, watersheds, or airsheds." Id. at 35. They argue that the defendants improperly selected the Pebble Creek watershed—a sub-watershed of the Fox River Basin—for their cumulative effect analysis. Id. They allege that drawing the line for consideration of cumulative impacts "with no explanation" is arbitrary and capricious. Id. The plaintiffs also argue that the Final EIS ignored the EPA's comment on the Draft EIS that called for a consideration of the WIS 59 highway widening project and WIS 83 highway widening project in the cumulative impacts analysis. Id. at 37.

The Final EIS stated the agencies' reasoning for selecting the Pebble Creek Watershed at §3.4.2:

> The Pebble Creek Watershed (shown on Exhibit 3-12) was selected for this analysis for two reasons: (1) as discussed below, wetlands, groundwater and primary environmental corridor are the key resources evaluated in the cumulative effects analysis; and (2) the watershed's boundaries include the project area and the area west of the project area that is most likely to experience development.

AR1197-98; <u>see also</u> AR669-670 (defending the selection of the Pebble Creek Sub-watershed as the scope of the cumulative impacts analysis in response to a comment by the EPA). While the Final EIS did not discuss precisely why it chose the Pebble Creek Watershed as opposed to the other boundaries, the agencies did not fail to provide their reasoning. In the same CEQ Guidance Statement that plaintiffs cite, the CEQ notes that:

> [i]t is not practical to analyze the cumulative effects of an action on the universe; the list of environmental effects must focus on those that are truly meaningful . . . . For cumulative effects analysis to help the decisionmaker [sic] and inform interested parties, it must be limited through scoping to effects that can be evaluated meaningfully.

COUNCIL ON ENVIRONMENTAL QUALITY, CONSIDERING CUMULATIVE EFFECTS UNDER THE NATIONAL ENVIRONMENTAL POLICY ACT (January 1997), Table 1-2, p. 8

https://energy.gov/nepa/downloads/considering-cumulative-effects-under-national-environmental-policy-act-ceq-1997 (last accessed Oct. 17, 2018).

The defendants have not demonstrated that the agencies acted arbitrarily and capriciously in selecting the Pebble Creek Sub-watershed.

### 9. *Mitigation*

The plaintiffs argue that the Final EIS phrased many of its mitigation commitments prospectively instead of definitively. Dkt. No. 31 at 38. For example, the plaintiffs cite the Final EIS at §3.4.5: "Waukesha County is

investigating a wetland mitigation bank in the Pebble Creek[,]" [present tense],
and the Final EIS at §3.16.3: "[i]n the design phase, [agencies] will investigate
measures to minimize wetlands impacts," [future tense]. Id.; see Final EIS
§3.4.5 at AR1200; Final EIS §3.16.3 at AR1304-05.

The defendants respond that the ROD (see AR13-19) contained a detailed
description of the project's mitigation, monitoring and enforcement efforts. Dkt.
No. 37 at 24. As to the prospective phrasing of the mitigation measures, the
defendants state that, at the early stage of the design process, the creators of
the Final EIS and ROD did not have enough details to make final decisions on
the particular mitigation and/or best management practices that will be most
effective in mitigating the project's environmental effects. Id.

The ROD details discussion on the mitigation efforts of the project. ROD
at AR13-19. The plaintiffs' argument is semantic. Although the defendants
stated what they were doing, and what they would do, the plaintiffs object that
the defendants did not *promise*, or contractually *bind* themselves, to take
certain mitigation measures. But phrasing mitigation strategies as prospective
is not arbitrary, capricious or contrary to law; in fact, the Supreme Court has
held that "it would be inconsistent with NEPA's reliance on procedural
mechanisms—as opposed to substantive, result-based standards—to demand
the presence of a fully developed plan that will mitigate environmental harm
before an agency can act." Robertson, 490 U.S. at 353 (finding that the Court
of Appeals erred in finding that NEPA "entail[ed] the further duty to include in
every EIS a detailed explanation of specific measures which *will* be employed to

mitigate the adverse impacts of a proposed action.") (internal quotations omitted) (emphasis in original). By phrasing several mitigation commitments as prospective rather than definite, the defendants did not act arbitrarily, capriciously or contrary to law.

10.   *Delegating mitigation*

The plaintiffs argue that the defendants did not undertake an independent examination of what mitigation efforts the agencies should take. Dkt. No. 31 at 39. They contend that the defendants relied exclusively on the EPA and Army Corps of Engineers' "uncritical" concurrence with a mitigation memo drafted by project administrators. Id. at 41. The plaintiffs note that, after the project re-design, the agencies discarded a mitigation condition that the Army Corps' of Engineers had previously mandated. Id. at 40. The plaintiffs also say that because the re-design increased the amount of damage to upland habitat that would result from the project, the defendants' reliance on the Army Corps' concurrence with their mitigation strategy violated NEPA. Id.

It appears that after finalizing the Final EIS and ROD, the defendants submitted a request for a wetland fill permit from the Army Corps of Engineers under the Clean Water Act. Least Environmentally Damaging Practicable Alternative ("LEDPA") Memo p. 2-3 at SAR29904-05. Because the project would impact a wetland (Wetland-8), the Corps imposed the following mitigation conditions for the project before the Corps would issue a permit: (1) "Preserve an offsite fen within the Upper Fox River Watershed to mitigate for impacts to W-8; (2) Permanent, legal protection of the interior forest habitat and

31

surrounding uplands on Buzz Hardy property; and (3) Mitigate for trees lost in the primary environmental corridor upland woods south of Sunset Drive." Id. at 2, SAR29904-05. In response, the defendant agencies re-designed the project to the Rotated Pebble Creek West alignment. Id. at 3, SAR29905. This redesign avoided impacting Wetland-8, which meant that they were no longer required to obtain a wetland fill permit from the Corps. Id. at 4-5, SAR29905-06.

The Corps imposed its original mitigation conditions based on the project's impacts on Wetland-8. Id. at 2, 29904-05. Once the redesign avoided that impact, both the EPA and the Corps concurred with the agencies' mitigation strategy and no longer required the permanent, legal protection of the interior forest habitat and surrounding uplands on the Buzz Hardy property. See EPA Letter, June 6, 2016 at SAR29922-23 ("Based on EPA's review of the re-evaluation, the County's letter, and U.S. Army Corps of Engineers' letter dated April 25, 2016 . . . EPA has determined that permanent, legal protection of the Hardy woods should become a voluntary measure."); see also Department of the Army Letter, April 25, 2016, at SAR29920 ("We concur with the lead agency finding that the Rotated PCW alternative proposed for the southern segment represents the least environmentally damaging practicable alternative . . . . While we do not find that legal protection of the upland forest habitat is required to ensure that the Rotated PCW alternative remains the LEDPA, it remains an environmental benefit worth pursuing.")

The Corps required the upland forest mitigation only because of the project's projected impacts to Wetland 8. Once the redesign avoided those

impacts, it followed that the upland forest mitigation requirement would drop from the picture. The court cannot conclude that the defendants impermissibly delegated their NEPA duties to the Army Corps' of Engineers. The record shows that the agencies presented a detailed discussion of the Rotated Pebble Creek West alignment in their memo to the Corps and to the EPA. See LEDPA at SAR29903-29910. The defendants requested agency concurrence, and they got it. While the new, Rotated Pebble Creek West alignment had greater upland habitat impacts, it also avoided altogether the impacts to Wetland 8. The court's role is not to second-guess the expertise of the agency in its weighing of certain environmental benefits as opposed to others; the court reviews only whether the agency followed the procedures prescribed by NEPA. See Habitat Educ. Ctr. Inc., 593 F. Supp. 2d at 1024.

11. *Supplemental environmental impact statement*

The plaintiffs argue that the defendant's reevaluation document identified significant environmental impacts from the project's redesign, meaning that the redesign required a Supplemental EIS. Dkt. No. 31 at 42. They note that the redesign called for an additional 11.2 acres of right-of-way and that in the intervening time between the Final EIS and the reevaluation, the defendant agencies identified approximately 6,500 tons of hazardous waste located within the project corridor. Id. The plaintiffs complain that the defendants ignored their obligation to analyze the environmental effects of removing the 6,500 tons of waste by simply stating that the waste's removal would be a positive effect. Id. The plaintiffs note that the CEQ regulations

33

require a Supplemental EIS whenever an impact is significant—positive or negative. Dkt. No. 38 at 16. The plaintiffs also fault the defendants for failing to discuss the CEQ regulations' factors for determining whether a re-design will have "significant" environmental effects. Id. (citing C.F.R. §1508.27).

The defendants counter that the reevaluation document showed that the relatively minor rotation lessened the adverse environmental impacts evaluated in the Final EIS without causing other significant environmental impacts not evaluated in the Final EIS. Dkt. No. 37 at 27. They also note that the reevaluation concluded that the right-of-way changes would not significantly change the environmental impacts of the project. Id. citing SAR29875.

 "CEQ regulations . . . impose a duty on all federal agencies to prepare supplements to either draft or final Environmental Impact Statements if there 'are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'" Marsh, 490 U.S. at 372 (1989) (citing 40 C.F.R. §1502.9(c)). When deciding whether to prepare a supplemental EIS, the agency applies a "rule of reason," and "need not supplement an EIS every time new information comes to light after the EIS is finalized." Id. at 373. As for a court reviewing the agency's decision, the Supreme Court has concluded that the APA's "arbitrary and capricious standard of §706(2)(A) governs a court's review of the 'narrow question' of whether an Environmental Impact Statement needed to be supplemented and should be set aside." Id. at 375-76.

40 C.F.R. §1502.9(c) provides that:

> (1) Agencies shall prepare supplements to either draft or final environmental impact statements if (i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. §1502.9(c). At 40 C.F.R. §1508.27, the CEQ regulations define the considerations by which agencies determine whether an impact will be "significant." "Significance" under §1508.27 has both "context" and "intensity" considerations. As for "intensity," 40 C.F.R. §1508.27(b) lists ten factors for agencies to consider. Paraphrased, those factors are:

> (1) Impacts that may be both beneficial and adverse;
> (2) The degree to which the proposed action affects public health or safety;
> (3) Unique characteristics of the area;
> (4) The degree to which the effects on the quality of the human environmental are likely to be controversial;
> (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks;
> (6) The degree to which the action may establish a precedent;
> (7) Whether the action is related to other actions with individual insignificant but cumulatively significant impacts;
> (8) The degree to which the action may adversely affect significant sites or important resources;
> (9) The degree to which the action may adversely affect an endangered or threatened species in the ESA; and
> (10) Whether the action threatens a violation of law.

While the defendants' reevaluation document did not include citations to the Code of Federal Regulations, the document considers the above factors. In Section Five, "Affected Environment and Environmental Consequences," the reevaluation contains topic headers that specifically address certain of the factors listed in 40 C.F.R. §1508.27(b). SAR29873. Section 5(A), "Affected

Environment Changes," considered whether the redesign would affect "any impact categories (e.g. transportation infrastructure, protected resources, land use plans, etc.)," which corresponds to 40 C.F.R. §1508.27(b)(8). Id. Section 5(B) "Law, Rule, Code Changes" considered whether any changes to laws, rules, or codes that could affect any impact categories, which corresponds to factor 40 C.F.R. §1508.27(b)(10). Id. Section 5(E) "Social and Cultural Impacts" considered the ways in which the re-design may impact the human environment, which corresponds to 40 C.F.R. §1508.27(b)(4) and (b)(5). Id., at SAR29876.  Sections 5(J)(K)(L)(M) & (O) all considered different, unique land characteristics of the area, which corresponds to factor 40 C.F.R. §1508.27(b)(3). Id. at SAR29878-83. And Section 5(N) "Threatened and Endangered Species (T&E) Impacts" considered whether there are any threatened or endangered species in the study area, corresponding to 40 C.F.R. §1508.27(9). Id. at SAR 29882. The plaintiffs' contention that the defendants failed to consider the significance factors of the CEQ regulation is not supported by the record.

As for whether the redesign's new right-of-way requirements were not significant, the court cannot conclude that the defendants reached that decision arbitrarily. Section 5(D) of the reevaluation (along with Tables 1 and 2 of the reevaluation (SAR29874-29875)) explicitly detail the changes in the right-of-way and conclude that: "the new right of way required as a result of this re-evaluation are [sic] not significant impacts. Most of the new right-of-way

required as part of this re-evaluation is strip takings resulting in minor impacts to properties and do not impact the use of the property." Id. at SAR29875.

As for the plaintiffs' charge that the defendants failed to analyze the discovery of 6,500 tons of toxic waste, the reevaluation document noted that this discovery "was not the result of the Rotated Pebble Creek West alignment." Id. at SAR 29884. It then cites and provides a concurrence letter from the Wisconsin DNR that approved of the removal of the contaminated soil. Appendix D to Reevaluation, Ltr. To Mark Walter (Jan. 28, 2016) at SAR29930. The reevaluation document further concludes that "this removal of hazardous waste due to grading and construction of an underpass for the Glacial Drumlin State Trail is not a significant impact." Id.; see also Comment 15, SAR 30007-08 (agency response to comment charging that the waste is a significant impact).

The record shows that the defendants undertook significant analysis of the project's redesign before concluding that the re-design did not require a Supplemental EIS. See SAR29871-29892. The court cannot conclude that the defendants violated NEPA in this regard.

12.    *The Endangered Species Act*

Finally, the plaintiffs contend that the defendants didn't properly consult with the Fish and Wildlife Service ("FWS") regarding the impacts of the project on the Northern Long-Eared Bat. Dkt. No. 31 at 47. They allege that no surveys accounted for the effects of the project's redesign on the bats' habitat. Id. at 48. They further argue that the Wisconsin DOT performed deficiently brief surveys

of the bats' habitat in August 2015 and that the Wisconsin DOT did not share these August 2015 surveys with the FWS. Id. Thus, the plaintiffs conclude, the FWS arbitrary and capriciously concurred with the Wisconsin DOT by not relying on the best available science. Dkt. No. 31 at 47 (citing 16 U.S.C. §1536(a)(2); 50 C.F.R. §402.14(d) ("Federal agency requesting formal consultation shall provide the [FWS] with the best scientific and commercial date available . . . for an adequate review of the effects that an action may have upon listed species or critical habitat."))

"The Endangered Species Act of 1974 (ESA), 87 Stat. 884, as amended, 16 U.S.C. §1531 et seq., is intended to protect and conserve endangered and threatened species and their habitats." Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 651 (2007). "Section 7 of the ESA prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora." Id. at 652. Section 7(a)(2) of the statute provides, in relevant part, that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ." 16 U.S.C. §1536(a)(2).

A separate section of the ESA, Section 4(d), provides that "whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary [of the Interior] shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species." 16

U.S.C. §1533(d). Here, the FWS issued a Final 4(d) Rule for the NLEB on January 14, 2016. 81 F.R. 1900-01, 2016 WL 147856 (Jan. 14, 2016).

In May 2016, the FWS issued a "Programmatic Biological Opinion for Transportation Projects in the Range of the Indiana Bat and the Northern Long-Eared Bat." ("BO") See SAR30256. The document stated that its purpose was to "streamline the Endangered Species Act (ESA) consultation process that is required when these projects may affect . . . the federally listed threatened northern long-eared bat (*Myotis septentrionalis*) (NLEB); and promote better conservation outcomes from these project [sic] for both species." Id. at SAR30262. This consultation document "provides advance USFWS concurrence with 'not likely to adversely affect' (NLAA) determinations that are consistent with these criteria, subject to project-level verification." Id. at SAR 30262-63.

On June 15, 2016, an agent with the Wisconsin DOT e-mailed the FWS requesting approval of the proposed project. The e-mail stated that "WisDOT intends to rely on the programmatic biological opinion developed for the final 4(d) rule and this submittal to satisfy our Section 7(a)(2) responsibilities, as outlined in the streamlined consultation framework." The request included the following:

> In accordance with the final 4(d) rule issued for the northern long-eared bat, WisDOT has determined that the proposed activity, described in greater detail below, will not result in prohibited take of the NLEB. The activity involves tree removal, but will not occur within 0.25 miles of a known hibernacula, nor will the activity remove a known maternity roost tree or any other tree within 150 feet of a known maternity roost tree from June 1—July 31.

39

Id. In response, on July 15, 2016, an officer from the FWS concluded that "[c]onditions and documentation for use of the northern long-eared bat final 4(d) rule have been properly implemented." SAR29928.

The plaintiffs have not alleged that the project will occur within .25 miles of known hibernacula or that it will remove a known maternity roost tree or any other tree within 150 feet of a known maternity roost tree from June 1 to July 31. Instead, they argue that those metrics should not be enough to conclude that the project will not adversely affect the bats. They provide no authority showing why the 2015 acoustic surveys provide a superior scientific metric than measuring the presence of hibernacula or maternity roost trees. The plaintiffs have given the court no reason to question the expertise of the FWS in its determination that the presence of hibernacula and maternity roost trees supplied a superior metric for determining whether a project would result in a prohibited take of the bats. See San Luis & Delta-Mendota Water Authority v. Jewell, 747 F.3d 581, 602 (9th Cir. 2014) ("The determination of what constitutes the '*best* scientific data available' belongs to the agency's 'special expertise . . . . When examining this kind of scientific determination, as opposed to simply findings of fact, a reviewing court must generally be at its most deferential.'" (quoting Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 103 (1983) (emphasis in original)).

The court cannot find that the agencies acted arbitrarily and capriciously under the ESA.

## IV. CONCLUSION

The plaintiffs have not demonstrated that the agencies' decisions and actions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

The court **DENIES** the plaintiffs' appeal of the agency decision. Dkt. No. 27.

The court **DENIES AS MOOT** the plaintiffs' motion for a telephonic status conference. Dkt. No. 45.

The court **ORDERS** the case **DISMISSED.**

Dated in Milwaukee, Wisconsin this 18th day of October, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**